This case involves a prisoner who was taken to the clinic because he was appearing severely ill. And before they took him, officers sprayed him twice with chemical agents, then lifted him onto a gurney and transported him to the clinic. The doctor looked at him briefly at the clinic and then sent him back to his cell without doing any tests, without ordering any treatment. And then disputed facts show that the doctor even went back to the cell at the insistence of the nurse, who said, Doctor, there's something really wrong with this patient. He seems very sick. Please come down and look at him one more time. The doctor just looked at him through the door in the cell, didn't do any kind of hands-on examination or communicate with him or order any kind of treatment or any follow-up at all, and just left. Didn't the doctor order a testing of his clothing to see if there was an infection to the soiled clothing? Well, even that is a disputed fact. The doctor says that there was a test of that, but there's no record of the test having occurred. And we don't need to believe everything that the doctor wrote in his report, because some of it seems to clearly contradict what actually happened in the clinic, according to the video. And apart from that, that test had nothing to do with the conditions that the doctor knew were an issue. That was a stool test for blood in the stool. It could show something like an ulcer. And the doctor here knew... You're correct, Your Honor. Kidney was the main medical issue, and the fecal test had nothing to do with a urinary issue of any kind. And there was no testing of anything related to the kidneys. And so I think a core issue here is the evidence that the doctor actually drew the inference that the patient had a kidney problem in that moment, an acute kidney problem. And the doctor testified at his own deposition to knowledge of the patient's history, including the bladder failure, which leads to backed-up plumbing, which in... That's his own words, which can cause recurring infections, and that the patient is constantly at risk of infection. And there was a test that had occurred about a week earlier for a urinalysis test that the defendants mentioned as evidence that the doctor could infer that the condition was not acute at that time. But the doctor himself testified that the patient always, at his current state, had a low-level infection, and it was just waxing and waning, and that urinalysis really meant nothing from day-to-day, whether it was positive or negative, that he knew that the patient was constantly at risk of a major infection and going into this death spiral of infection, building on dementia, and just sort of feedback cycles of organ failure and infection, and each of them making the other more likely. And so in those circumstances, to do nothing was clearly deliberate indifference, and I think it's instructive to look at the framework in the recent case that both sides cited in their supplemental authorities, Petzold, which said that the amount of risk that a doctor or a medical provider can be imputed to understand at the time he or she sees a patient is based on the symptoms known to that person at that time. And so that case presented a good balancing of where to draw the line, because one defendant, a nurse, knew of basically two symptoms in the Petzold case, knew of low-level infection limping and pain, and it could only be inferred that that nurse knew that a common explanation of that would be ankle sprain. And even though it might have been negligence not to examine the ankle or ask more, we can only infer that the nurse knew what she would know from what she had observed. On the other hand, there was another defendant who was not even a medical worker at all, but he had actually seen the swollen ankle, and the court said, okay, well, he knew of pain, he knew of limping, and he knew of major swelling. And so that's enough that a reasonable person in his shoes would understand that there was a risk of ankle fracture. And so he should have, he would be deliberately indifferent for not doing more, except he, the plaintiff failed to prove a different element against him. So I think the same analysis applies here, that the doctor was aware of a long history. He was aware, and that history included kidney failure, it included bladder failure, it included the recurring infections and the risk that those infections could become deadly. And then the patient was brought in for kidney pain. He was obviously in very poor health. He had suffered extremely rapid weight loss. The doctor had never seen a patient brought in after being pepper sprayed like this. So he was aware that the patient was behaving strangely, and he was aware that... Why was the pepper spray used? Well, the pepper spray, the patient wasn't complying with instructions to get up and come to the door and put his hands up against the slot for restraints. And there, I mean, then we go into an analysis of whether excessive force was used by the officers who pepper sprayed him. But I just want to touch on the fact that the doctor knew that these were extraordinary circumstances from just the fact that the patient was brought in after being pepper sprayed. He was resisting the care? That's why the pepper spray was used? Well, he was not resisting. He just wasn't moving. He wasn't responding. Officers were ordering him to get up, and he would say, okay, I'll comply, I'll comply, but then he just continued to lie there. And so the question there is... How is it deliberate indifference when it sounds like the guards are using the spray essentially to try to get him the care that he's essentially not cooperating with? Well, there, the question is whether the totality of the circumstances known to the guards showed them that... I mean, they could have just left him there and just said, okay, fine, you're not going to get the care today. If you don't want it, that's fine. It seems to me that the pepper spray is being used in order to try to give him care. Am I misunderstanding the facts? I believe so, Your Honor. I think that would be a defense that the guards would use, but the facts and the inferences that can be drawn from those facts are very disputed here. And our position is that a jury could infer that they knew that the threat that he would present a danger if they didn't pepper spray him was so low that the balancing of the need for force against the risk of harm from using force weighed against using pepper spray. But you're acknowledging, it sounds like, that he was not cooperating. He was told, you know, it's time for your care, and he was not complying. What would have been an appropriate reaction? Well, what they ultimately did, which was just to go in, pin him to the floor, make sure he wasn't a threat to anyone, and handcuff him and lift him onto a gurney and take him to the clinic. And so, ultimately, if they could reasonably tell that he wasn't able to comply. And that's our position. They could see that he was lying there naked, extremely emaciated. They could smell, according to inmate accounts, the urine and feces that he was lying in, incontinent, on the floor. They could see that one of the guards said that he knocked on the window and tried to communicate with the prisoner and couldn't even tell if the prisoner was aware that he was trying to talk to him. We can also infer what they could see based on what people reported, like a mental health worker just an hour earlier, and what we can see after he's brought out of the cell from the video recording, which is that he was extremely debilitated, unable to stand or move. The officers and the court, ultimately, or a jury, weighing various factors. And so it's not a matter that's easily resolved by summary judgment. How much weight to give to the fact that the officers could tell that he was a very diminished threat because he a prisoner is unable to cooperate, pepper spray should not be used. And how much weight to give to the fact that they did nothing to temper the severity of the force by decontaminating him after they sprayed him with pepper spray. And there were two opportunities to decontaminate him. One would be before taking him to the clinic. And the plaintiff's expert explained that typically that is part of preparing a person for the clinic to make it so that they're more able to speak and open their eyes and communicate with the doctor is to clean them up, at least wipe their face. And here the prisoner was on a gurney strapped down. He couldn't even wipe the chemical agents off his face. But then after the clinic, he was brought back to an empty cell and left there naked. There was not a towel, not a paper towel, not anything, no bedding in the cell, no way to clean himself. And again, by this time they had interacted with him more. They could tell that he really wasn't able to even raise himself off the floor to get to the sink to run some water. He had no way to decontaminate himself. So there they completely failed to temper the severity of the force by just leaving him just motioned, like incapacitated on the floor with pepper spray all over his body, on his face, in his eyes. They did take him to a different cell. Yes, that's correct. Because they were going to decontaminate his cell. So I mean, that shows they were taking some efforts to... Yes. But then that raises other problems, because it also meant that he was removed from anything he could use to clean himself. And he was also away from his inhaler, which was part of his necessary medical supplies to manage his asthma. And that was very easy to see. He was in a bare, empty cell. Anyone could... I'm confused about whether he had asthma or not, what the record shows. Wasn't there a nurse or someone who said he didn't have asthma, and then there's arguments he did and they knew about that? What evidence should we look to? Well, there is evidence on both ways about whether he had or did not have asthma. But ultimately, there's evidence that he did, which should be... I guess the key is that they knew he had asthma. What evidence can you point us to that they knew, the guards or the doctor knew he had asthma? Well, the nurse testified that they knew, that they had a list that was available to them. And the reason she didn't specifically tell them was because they already knew that he had asthma. That's the strongest evidence. In the medical record, there's a nurse practitioner's order saying, please be sure the patient is on the do not gas list. And then in the medical records it says, do not gas list. And then in the next column it says asthma. So there's evidence that this list existed. The nurse says that she didn't tell the guards he had asthma because she didn't need to tell them, because they already knew. I think in terms of both the excessive force, I just want to emphasize finally that the factors weighing against using pepper spray or chemical agents became even more extreme after the first use of pepper spray. Because at that point, they had already tried. They had sprayed the guy. He still didn't move. He still didn't do anything. And so all the factors weighing against using pepper spray now became just doubled, because they could see that it didn't get a response. It didn't increase their safety in any way. And they used it again. And then finally they went in and just used hands-on restraints, which the plaintiff's expert has explained were the common recourse that prison guards always know they have available when pepper spray is not the best course of action. And so from the beginning, they knew that they shouldn't use pepper spray on an incapacitated inmate. And that just added up to excessive force given just the weighing of all the circumstances known to the officers at that time. I think that's all I have time for. All right. We have your five minutes for rebuttal. I guess the corrections officer testified at no time did he ever say that he would not go to medical. It's not a question of him refusing to go. He was just clearly incapacitated. Thank you. All right. We'll hear first on the other side from Ms. Frisch. May it please the court. Abigail Frisch for Defendants Appellees Groover, Grass, and Seymour, the officers. My colleague will then address the claim against Defendant Appellee Biddle. Plaintiff is asking this court to be the first to hold that it violates the Eighth Amendment to administer OC spray for an inmate who is not complying, who is not restrained and subdued, and who has a history of violence. Plaintiff is also asking this court to be the first to hold that it violates the Eighth Amendment unless the officers themselves perform a decontamination as opposed to make the decontamination materials available. This court should decline to do so. Plaintiff has failed to establish a violation of the Eighth Amendment and plaintiff has failed to identify a clearly established law that was violated in this case. Plaintiff attempts to raise a factual issue with respect to Nurse Killian's testimony about a do not gas list, but she then retracts this testimony at page 4221 in the record by saying that actually these lists are for facilities that do not have 24-hour medical care, which was a page after she testified that the unit in question, the Clements unit, did have 24-hour medical care. All of the other evidence in the record shows that there was no such list at the Clements unit, including the policy itself and the officers' depositions. And at this motion for summary judgment stage, we know from Scott v. Harris that if the plaintiff's version of the facts is blatantly contradicted by the record, the court is not required to accept those facts as true. So there are no factual disputes and we're left with plaintiff's real dispute, which is the legal argument that it was unreasonable for the guards to administer O.C. spray in this instance. And that is not the case here based on the facts and circumstances and their knowledge of Mr. Woolverton's past and his conduct on that day. Mr. Woolverton's history included his housing assignment in administrative segregation, which is among the most dangerous offenders in custody. It included a history of feigning illness and then flipping the script and becoming violent. And it included a history of violence, which included assaults up to seven correctional staff, which is at page 3248 in the record. His conduct that day was consistent with that history. There's undisputed evidence in the record that he was moving to some degree, that he was vocalizing and saying that he would comply and that he was not, in fact, complying. And we know from the Supreme Court's opinion in Whitley v. Albers that an inmate's equivocal conduct, that is, conduct that could be interpreted as a threat by the officer, even if it is intended by the inmate to be benign, does not make force against that inmate unreasonable. This court recently addressed the concerns, the heightened risks of entering an inmate's cell, particularly when that cell is in administrative segregation, and particularly when that inmate has a history of feigning illness in Arenas v. Calhoun. Plaintiff's cases at best stand for a rule that spraying a chemical agent without a warning or when the inmate is restrained and subdued can be excessive force, or a rule that impeding an inmate's ability to decontaminate himself can be excessive force. Plaintiff has no cases from this circuit or the Supreme Court saying that spray is excessive force. In Bourne v. Gunnels, the only discussion of excessive force related to the physical force that the officers applied, which came after the inmate had been handcuffed, which came after the inmate had been sprayed. In Furness v. Sullivan, out of the Ninth Circuit, there was excessive force in that case because the officer sprayed and the plaintiff claimed that the officer had given no warning or order verbally before administering the spray. In Iker v. Shreve, out of the Fourth Circuit, the inmate claimed that he had made efforts to comply, which made the third and fourth administrations of spray excessive force in that case, but importantly, the first and second sprays were not excessive force. The court explicitly said that because the inmate was not complying with orders, even though he was lying unresponsive on the floor, the first two sprays were not excessive force in that case. Moving to the decontamination, there are, again, no cases from the Supreme Court or from this circuit where an officer not performing a decontamination has supported an excessive force claim. Just two weeks ago, this court in Hope v. Anderson, in an unpublished opinion, explained that there is no clearly established law in this circuit supporting an excessive force claim for decontamination of chemical agents. In Iko, again, out of the Fourth Circuit, the officers had left the inmate in handcuffs, which is the reason that the officers impeded his ability to decontaminate himself. Similarly, in Danley v. Allen, the officers only gave the inmate two minutes to shower, which was against the policy. They put him back in the same cell, which we know in this case they put him in a new cell, and they denied his request for medical treatment, when in this case it's undisputed that Wolverton had two post-use-of-force medical evaluations. That day, we know that Mr. Wolverton was moving and vocalizing, which was consistent with his previous history of feigning illness and then becoming violent and flipping the script. We know that all three officers knew about this history and reasonably thought that that day, Wolverton was a threat based on the previous circumstances he had engaged in the same conduct and had still been a threat. So, Sgt. Gratz testified that in his experience with Mr. Wolverton in that housing assignment on that cell block, he had known that Mr. Wolverton had feigned illness before and then become violent and belligerent and difficult to deal with. Lt. Seymour and Major Groover were both aware of the previous use of force on October 7th, where Mr. Wolverton had been pretending that he couldn't walk, refusing to walk, and appearing weak. And then once he was in the office, became violent and spit on staff and was screaming, cursing, threatening, attempting to pass on contagious diseases by spitting. And all of these events were fresh in the officer's mind and well known to the officers when they detected a threat in attempting to extract him from the cell on that day. Plaintiff suggests that the officer's first recourse should have been hands-on and I think it's important to understand that that's an escalation of force. It's clear from the use of force policy and in all the cases plaintiff has cited that it is less force to administer a chemical agent to gain compliance than it is to enter a cell and physically extract an inmate. It is far more dangerous to both the officers and the inmate when a physical cell extraction is required. If the court has no further questions, I can submit. All right, we have your argument. Now hear from Dr. Biddle's counsel, Ms. Speier. Your Honor, may it please the court. My name is Bethany Speier, counsel for Defendant Appley, Dr. Biddle. Plaintiff has not established that a genuine issue of material fact exists that Dr. Biddle violated the Eighth Amendment by committing deliberate indifference, nor has he demonstrated that clearly established law existed that was violated by any of Biddle's actions on that day. First, I want to be clear about what this claim is about. Everything that happened prior to October 20th, 2013 is not a part of this appeal. Everything happening prior to that is outside the statute of limitations. So this court is asking, on October 22nd, was what Dr. Biddle did, was that a violation of the Eighth Amendment through deliberate indifference? Plaintiff brings two separate claims of deliberate indifference. First, that Dr. Biddle failed to monitor Wolverton's decline due to kidney failure. And second, that Dr. Biddle was deliberately indifferent by refusing to remove the O.C. spray after Wolverton was brought into his office. Neither of these claims can succeed. If we acknowledge that the decline in Wolverton's kidneys was a serious medical need, and there was an objective showing of that serious medical need, plaintiff has not established that Dr. Biddle had subjective knowledge on that day that Wolverton was experiencing a life-threatening medical emergency. In Cleveland v. Ball, decided in September by this court, the nurse in that case was found to not be deliberately indifferent because she did not know, plaintiff did not show by the evidence that she knew on that day that the inmate was suffering from a life-threatening medical emergency. The same thing is true in Petzold, as counsel referred to. Neither of the people in Petzold accused of deliberate indifference were found to be deliberately indifferent. Because they did not know at the time, they did not have subjective knowledge at that time, on that day, that there was a serious medical need. But even if Dr. Biddle can be shown to have subjective knowledge at that time of the seriousness of Wolverton's medical needs, there is no evidence that he denied or delayed necessary treatment. Plaintiff's experts have not offered any evidence as to what else Dr. Biddle should have done. At 3598 of the record, Dr. Biddle writes down that Wolverton was not experiencing any asthmatic attacks, that he had clear lungs, his voice was loud and clear, and his pulse was good. At that time, Wolverton had not expressed any other complaints, he had not given any other indication that he was in pain, and there was no other reason to continue the examination at that time. If then we turn to the second claim of deliberate indifference, that of refusing to remove the O.C. spray from Wolverton's face, again, even if we assume that the application of the O.C. spray constituted a serious medical need, there is no evidence that Dr. Biddle at that time knew of any serious medical need. Additionally, he did not deny or delay treatment. He checked the lungs to make sure there was no asthmatic attacks going on, he checked to make sure that Wolverton could breathe, and as he could, he sent him back to the cell. Why did the nurse say he needed to go and see the doctor? What was it that triggered that? That was at the beginning of this whole thing. Correct. Nurse Killian was aware that Wolverton hadn't seen a doctor in several days, and so she took it upon herself to insist that he was taken to see Dr. Biddle. He had refused exchange of catheters for several days, and she wanted to make sure that he was examined, and so there is no evidence in the record that Dr. Biddle requested this meeting or this examination, but Nurse Killian was aware that he had not been seen in a while. Secondly, plaintiff has not shown that there is any clearly established law in the Supreme Court, in the Fifth Circuit, or even out of circuit precedent. There is no need to get to this question. This court can decide and find that there is no genuine issue of material fact that Dr. Biddle violated the Eighth Amendment, but if it does choose to go on to the second inquiry of qualified immunity, there is no clearly established law on this issue. All of the cases that this court has decided show that if anything, anything that Dr. Biddle has done, anything that plaintiff's counsel has mentioned, go to possibly a claim of medical malpractice or negligence, they do not arise anywhere near the standard necessary to find deliberate indifference. If there are no further questions. All right. Thank you, Ms. Speier. We'll hear a rebuttal. Thank you, Your Honor. If you could start off just by identifying what exactly is it that Biddle, Dr. Biddle, should have done in your view. Yes. Well, Dr. Biddle, when I asked him what he would do for this condition, the first thing he said was take the patient's temperature, which he didn't do. And then with further questioning, he said, well, I would want to look at white blood cell count, blood pressure, and then do a mental status exam. And he mentioned taking the temperature again. And he didn't do any of those things. And what would those things have revealed? Those would reveal if there was, well, the severity of a kidney infection at that point. And then he testified about how to treat a kidney infection and that it was very important to stay on top of something like this because of that feedback cycle. So I explained that the patient was very likely to go into a state of decline. So he was aware of the need for these first testing. What did Wolverton tell the doctor? Wolverton really didn't. He wasn't very able to communicate. That's part of one of the symptoms that the doctor was aware of was that Wolverton was very incoherent and that dementia was a symptom of the very disease that the doctor was monitoring at this point. So it's not that Wolverton was telling the doctor I have these problems. No, he was not. He was aware of Wolverton trying to speak, but it's almost as if he just can't really form words. He's moaning with every breath and he's sort of mumbling incoherent statements in response to questions by the nurse and the doctor. He's just unable to communicate. And the doctor explained that with kidney failure, toxins build up in the blood supply and those impair cognitive function and a person loses the ability to communicate. And if you treat the disorder, then they can very rapidly come back to their normal selves. So he's aware that this inability to respond to questions is one of the symptoms of the very disease that he knows Wolverton's at risk of becoming more infected by. I want to touch on the doctor's statement in his medical chart note that the kidneys were non-tender. Just based on what we know from before and after the moment that the doctor did that analysis, it's not plausible that the kidneys would be non-tender at that point. The autopsy report from the death that occurred just ten hours later said that the kidneys were filled with abscesses and profuse infection and that the bladder was filled with pus that had come down from the kidneys. And Wolverton was brought into the clinic for kidney pain. And then the doctor noted other things in that same report that seemed completely implausible and very self-serving. He wrote that Wolverton's voice is loud and clear, which was absolutely contradicted by the video recording. And he wrote that Wolverton spit on the guards and the doctor. And the video contradicts that, and as well, the guard who ordered the spit mask testified that Wolverton never actually tried to spit on anyone. The guard was just worried that he might because he was clearing his throat, getting the mucus out of his throat that was a normal byproduct of being pepper-sprayed, but that he never tried to spit. Have he done that on a previous occasion? I think that he may have, yes. I'm not trying to say he was a great guy and never tried to spit on anyone, but the spitting here is, I mean, he just didn't. And that wasn't a major security concern. They didn't even try to put on a spit mask until 10 minutes after they had him in restraints. They were covered from head to toe in protective gear, and a spit mask is a simple measure for preventing spitting, if that's their concern. But they had him in the clinic before they did that. So just turning back to the guards for a minute, the core disputed fact is whether those officers could tell that Wolverton was so sick. That he couldn't comply before they used pepper spray on him. Because if they could tell that, then they would know that ultimately they would have to do these hands-on restraints anyway. And so even if pepper spray would be a lesser use of force, if it could be the way to gain compliance, if you know that you're going to have to do both, then pepper spray is not less than just going to the hospital. So I'm going straight to the solution that will ultimately. Thanks, Bayer. Thanks to both sides for the argument. That concludes today's docket, and the court will be in recess.